**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| Kimberly Adams | ) |
| 704 NE Hunters Rdg. | ) |
| Lee's Summit, MO  64086 | ) |
| | ) |
| Susan Bailey | ) |
| 6226 N. Cypress Ave. | ) |
| Kansas City, MO 64119 | ) |
| | ) |
| Cathleen Cameron | ) |
| 318 11th Pl. | ) |
| Rogers, AR 72756 | ) |
| | ) |
| DeLisa Cook | ) |
| 811 NW 17th | ) |
| Blue Springs, MO  64015 | ) |
| | ) Case No. 4:13-cv-00802-BP |
| Denise Davis | ) |
| 30409 E. Hanna Rd. | ) |
| Buckner, MO  64016 | ) |
| | ) |
| Ruby Eason | ) |
| 10521 E. 35th Terr. S | ) |
| Independence, MO  64052 | ) |
| | ) |
| Vivian Felker | ) |
| 510 N. Seminole | ) |
| Independence, MO  64056 | ) |
| | ) |
| Wendy Gardner | ) |
| 601 N. Savage Ct. | ) |
| Independence, MO  64050 | ) |
| | ) |
| Sharrye Hagins | ) |
| 809 N. Apache Drive | ) |
| Independence, MO  64056 | ) |
| | ) |
| Alice Jessip | ) |
| PO Box 34 | ) |
| 3253 Concord Church Rd. | ) |
| Bates City, MO  64011 | ) |
| | ) |

Cynthia Justice                                   )
13022 E. 45th Terr. S                  )
Independence, MO  64055                           )
                                                  )
Marjorie Keeran                                   )
2515 N. Yocum Rd.                                 )
Independence, MO  64058                           )
                                                  )
Sonya Lackey                                      )
1205 NW Canterbury Rd.                            )
Blue Springs, MO  64015                           )
                                                  )
Julie Mackie                                      )
425 NW Eastwood Dr.                               )
Blue Springs, MO  64014                           )
                                                  )
Michelle Murphy                                   )
18911 E. 22nd Terrace North            )
Independence, MO 64058                            )
                                                  )
Peggy Newkirk                                     )
1207 Ragan Dr.                                    )
Pleasant Hill, MO  64080                          )
                                                  )
Heath Parker                                      )
1624 NE Thones Dr.                                )
Lee's Summit, MO  64086                           )
                                                  )
Deborah Reed                                      )
32500 Mackey                                      )
Buckner, MO 64016                                 )
                                                  )
Phyllis Richards                                  )
35406 E. Pink Hill Rd.                            )
Oak Grove, MO  64075                              )
                                                  )
Dora Sanders                                      )
5401 NE Scenic Dr.                                )
Lee's Summit, MO 64064                            )
                                                  )
Alma Ruth Smith                                   )
6728 Cleveland Ave.                               )
Kansas City, KS  66104                            )
                                                  )

2

Annette Tann                                          )
5802 Manning                                          )
Raytown, MO  64133                                    )
                                                      )
Sheryll Thomas                                        )
POB 286                                               )
Bates City, MO 64011                                  )
                                                      )
Linda Vande Voorde                                    )
18604 E. 9th St. N                                  )
Independence, MO  64056                               )
                                                      )
Rowena Washington                                     )
3118 Agnes Ave., Apt. 2                               )
Kansas City, MO  64128                                )
                                                      )
                          Plaintiffs,                 )
                                                      )
        vs.                                           )
                                                      )
J.P. MORGAN RETIREMENT PLAN                           )
SERVICES, LLC,                                        )
                                                      )
and                                                   )
                                                      )
JP MORGAN CHASE & CO.                                 )
                                                      )
and                                                   )
                                                      )
J.P. MORGAN INVESTMENT MANAGEMENT,  )
INC., d/b/a JP MORGAN ASSET                           )
MANAGEMENT                                            )
                                                      )
and                                                   )
                                                      )
J.P. MORGAN INVEST HOLDINGS, LLC                      )
f/k/a J.P. MORGAN INVEST, INC.                        )
                                                      )
and                                                   )
                                                      )
James E. Staley                                       )
                                                      )
                          Defendants.                 )

3

## FIRST AMENDED PETITION/COMPLAINT

## INTRODUCTION

1.      This case arises from the Defendants' breach of fiduciary duty and failure to prudently manage the pooled stable value investment fund the Defendants called "SAIF". Plaintiffs invested their retirement funds in SAIF. This case also arises from the false public representation and willful misconduct in offering SAIF as a the sole stable value product for the conservative, safe harbor "slot" available in all retirement Plans (including Plaintiffs') administered by Defendants. The Defendants are: JP Morgan Chase Bank, N.A. ("Chase Bank"), J.P. Morgan Retirement Plan Services, LLC ("JPMRPS") and JP Morgan Investment Management, Inc. ("JPMAM") and James E. ("Jes") Staley (collectively, "JPM", "JP Morgan" or, at times, "Defendants").

2.      This case originated in Missouri state court where Plaintiffs asserted Missouri state law claims against JPMAM, JPMRPS and Staley based on misrepresentations in marketing the fund as "stable value" and causing SAIF to be the only "conservative" default option in all Plans administered by JPMRPS. Over Plaintiffs' objections and opposition, JPM successfully removed this case to federal court and the court sustained JPM's position that this court has removal jurisdiction based on ERISA preemption. Because of the court's ruling, finding that ERISA preempted Plaintiffs' Missouri law claims, Plaintiffs present herein claims against Chase Bank and the other Defendants under ERISA for using the involved investment funds in SAIF imprudently, taking undisclosed risks and for breach of fiduciary duty such that Chase Bank breached its expressed duties as trustee for the participant Plaintiffs in the "Stable Asset Investment Fund" (referred to as "SAIF", "JPM Stable Value Product", or "JPM Product"), a financial product controlled by JPM purportedly for the benefit of Plaintiffs who were investors

of retirement funds in SAIF during 2009-2012, and violated its duty to properly diversify investments in SAIF.

3.      Defendants in pursuing ERISA preemption for this case, have asserted that the conduct Plaintiffs alleged in Missouri state court are actionable under ERISA stating that "Section 1132(a)(3) authorizes ERISA Plan participants to sue non-fiduciaries who knowingly participate in a breach of fiduciary duty." JP Morgan *Ashurst* Opposition Brief, Oct. 22, 11/12/12 at 12. Thus, while specifically reserving their positions set out on their Motion to Remand, Plaintiffs have pleaded ERISA claims consistent with the court's ruling that Plaintiffs' allegations are preempted by ERISA and consistent JP Morgan's admissions in briefing that opposed remand of the case.

4.      In opposing Plaintiffs' Motion to Remand, Defendants admitted that, assuming Plaintiffs' allegations are true, Defendants violated ERISA by acts in furtherance of the alleged scheme and wrongly profited from the sale of the JPM Product. Defendants publicly presented SAIF as having superior safety and consistent and stable yield performance. See JP Morgan Opposition Brief 11/29/12 at 6, 7 fn 2, 8-10, 12.

5.      JP Morgan admitted and asserted in their Opposition Briefing on Motion to Remand, Case No. 4: 2-cv-01244, Dkt. Doc. 22, 11/29/12, that:

a.      "ERISA plainly does provide a remedy if Plaintiffs can prove their claims." Opposition at 6.

b.      Section 1109(a) permits recovery of losses to a plan and disgorgement of profits, the remedies sought here. Opposition at 7, fn 2.

c.      Thus, to the extent that Plaintiffs seek payment of disgorged fees, they are bringing a claim for Plan benefits. That claim falls squarely within ERISA's enforcement scheme. Opposition at 8.

d.      Plaintiffs' claim that "Defendants were investing a substantial portion of the assets of [SAIF] into unduly risky mortgage-backed assets" necessarily asserts that Defendants breached their fiduciary duty to prudently manage the ERISA plan assets…this claim is covered by Sections 1109(a) and 1132(a).." Opposition at 9.

e.      Plaintiffs' misrepresentation claims fall squarely within the scope of ERISA's enforcement scheme…" Opposition at 10.

f.      Section 1132(a)(3) authorizes ERISA Plan participants to sue non-fiduciaries who knowingly participate in a breach of fiduciary duty. Opposition at 12.

6.      Plaintiffs, as investors in SAIF during 2009-2012, suffered damages to their Plan retirement accounts in that time period. Immediately after their annual, earned retirement funds for the year were inserted into SAIF, SAIF's crediting rate plunged as JPM reacted to SAIF's huge losses. In 2009, Plaintiffs and the other SAIF investors suffered a sudden and severe loss in the market value in their SAIF investment – an approximate $100 Million loss in a $1.1 Billion dollar fund. This loss was a direct result of JPM's imprudent investments and mismanagement of SAIF. JPM compounded the losses these Plaintiffs' suffered by an accelerated reduction in the crediting rate (i.e. the return paid Plaintiffs – 2009-2012) that, in effect, confiscated a major portion of the earnings yield on SAIF's assets in 2009-2012 to make up for the $100 Million loss caused by JPM.

6

7.      In his extensive report, Dr. William Goetzmann, Professor of Finance at Yale University, set out the results of his research that led to his finding that JPM's mismanagement of SAIF damaged participants invested in SAIF in 2009-2012. Attached as Exhibit A are relevant portions of his reports.

8.      JPM did not prudently manage SAIF as a conservative, pooled stable value fund. JPM violated basic tenants and principles of constructing a portfolio of assets that could constitute a pooled stable value product. In a stable value fund, the book value withdrawal rights and the use of a formula driven crediting rate (which is the return to the investor) that drives market value to book value demand that a prudent manager avoid taking on levels of risks that expose the assets to more than minimal volatility in market value. JPM did not avoid those risks – just the opposite.  In a reach for yield, it imprudently embraced those risks through 2009 and beyond.

9.      Relatedly, the overriding representation of SAIF to all JPMRPS Plans as a "pooled stable value fund" was forced to make material changes to its investment guidelines in January, 2010 after its imprudent actions had caused damages to Plaintiffs and all other participants in SAIF.

10.      The plunge in SAIF's crediting rate (2009-2012) was a predictable and (for JPM) a deliberate consequence of the unduly risky bets it made. The major driving motive behind JPM's imprudent management and misidentification of SAIF as a stable value product arose from the desire to grow the SAIF fund in retirement plans, like Plaintiffs' Plan, administered and managed by JPMRPS in order to gain the management and administrative fees from placement of a JPM proprietary product. JPMRPS made SAIF the only "conservative", default investment

choice for 25,000 participants in over 200 plans captive to JPMRPS's administration and control of Plan investment line-ups.

11.     JPM's mismanagement, i.e. converting the pooled stable value fund SAIF to a higher risk bond fund in a chase for high yields, was used by JPM to put SAIF into and retain SAIF in over 200 retirement Plans, like Plaintiffs' GEHA Plan, that JPMRPS administrated. JPM had acquired a very small pooled stable value fund that JPM renamed "SAIF" and then grew it within JPMRPS's plans to place "billions" in Assets Under Management ("AUM") ---- therefore earning management fees of many tens of millions of dollars off of the billions of dollars in AUM.

12.     The historical use of the American Century Stable Asset Fund ("ACSAF") in the pooled stable value "space" or "slot" in JPMRPS administered plans, and JPMorgan's actions to push the ACSAF out of all JPMRPS plans and capture the JPMRPS "stable value safe harbor slot" is background to what happened to damage Plaintiffs in 2009-2012. JPM employed risky strategies in SAIF to temporarily gain a higher "crediting rate" paid Plan participants. In essence, in the reach for yield, JPM ran SAIF as a bond fund with a higher risk profile than prudent for a pooled stable value fund.

13.     This pooled stable value "space" or "slot" in retirement plans is, by both industry standards and as recognized by JPM, designed for small Plans with an approximate $50 to $75 Million (or less) in assets available for the stable value "slot" in the retirement Plans.   As administered by JPMRPS, the JPM pooled stable value option became the sole stable value option to persons seeking a stable value investment of their retirement monies.

14.     Because of the imprudent and hidden risk characteristics in SAIF's investments, including large, non-diversified bets in non-agency mortgage backed assets, the value of those

8

investments fell substantially in late 2008 and early 2009 compared not only to its published and advertised benchmark and other relevant benchmarks, but also in comparison to all other stable value funds used in retirement plans like Plaintiffs'.

15.   Two events preceding this lawsuit, independently, demonstrated JPM's mismanagement of SAIF.

16.   First, in action constituting an admission, JPM materially revamped the SAIF Investment Guidelines in January 2010, in a belated effort to limit and remove its imprudent use of investments having too much risk for a pooled stable value fund. The revamped 2010 Investment Guidelines and backstops by JPM were necessary to enable SAIF to maintain the insurance wrap feature of stable value funds. That JPM had to take this action is itself an admission of its prior imprudence and breach of fiduciary duty. It still took many more months after 2010 to work off the illiquid, non-diversified, large positions in lower credit quality assets that JPM had imprudently used in SAIF. By January, 2010, much of the damage was done. JPM retained, however, the wrongfully secured AUM in JPMRPS managed Plans upon which it continued to earn its management fee. Besides chaning its Investment Guidelines, JPM also withheld, i.e., did not distribute, SAIF assets earning by "artificially reducing the crediting rates". JPM did this to make up for the fund's losses of over $100 Million.

17.   Second, the initial use by JPM of inappropriate risks in SAIF was first uncovered in extensive litigation that resulted in findings set out in an August, 2011 Arbitration Award. Attached as Exhibit B are the findings concerning SAIF. Dr. Goetzmann's testimony and expert report were found "credible" and "actually provided analysis of economic harm." Award at 63. He found that "investors in JPM's stable value products paid for the significant decline in their stable value assets through lower crediting rates [in 2009 and subsequent years]." Goetzmann

Rebuttal Rpt. at 19. The Plaintiffs are among the "investors" Dr. Goetzmann is referring to and this lawsuit seeks to recover the losses that Dr. Goetzmann identified.

## PARTIES

18.     Plaintiffs owned, purchased and invested in SAIF in 2009-2012 and, during that time, were employees of Government Employees Health Association (GEHA). GEHA is located in Jackson County, Missouri, with offices in Independence and Lee's Summit, Missouri where Plaintiffs were employed.

19.     Plaintiffs are, and at all relevant times have been, participants (as defined in ERISA § 3(7), 29 U.S.C. § 1002(7)), in the GEHA 401(k) Retirement Plan (the "GEHA Plan"). At all relevant times, the GEHA Plan has been a defined contribution retirement plan that is subject to ERISA because, inter alia, the Plan provided for individual accounts for each participant and for benefits based solely upon the amount contributed to that participant's account, as well as any income, expenses, gains and losses, and forfeitures of accounts of other participants that could be allocated to such participant's accounts.

20.     Chase Bank is a National Banking Association organized under the laws of the United States, with its principal place of business in New York, New York. Chase Bank is added as party Defendant based on the Court's Order of Remand finding that ERISA has been inherently implicated in the wrongful actions alleged in Plaintiffs' original action and the new ERISA Counts reflect ERISA violations consistent with the Court's June 16, 2014 Order. Chase Bank as Trustee of SAIF is an ERISA fiduciary by terms of the below identified Declaration of Trust.

21.     JPMRPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business now located at the Sprint Campus on College

10

Boulevard, Overland Park, Kansas.  At the time of the acts alleged herein, JPMRPS was located on Ward Parkway in Jackson County, Missouri. JPMRPS participated, directly and indirectly, in the sale of securities, as defined by the Missouri Securities law, to Plaintiffs and participated in advising Plaintiffs as to the attributes of those securities. JPMRPS made SAIF the only stable value available to Plan participants.  Plaintiffs seeking stable value only had SAIF to choose from in the line-up of investment options in the Plan.

   22. JPMAM is the marketing entity for JP Morgan Investment, i.e., products. JPMAM participated in the scheme described herein and in the management of SAIF. JPMAM is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPMAM is an affiliate company to JPMRPS and it uses the name "JP Morgan Asset Management" in its marketing, in conjunction with JPMRPS, the SAIF product.  JPMAM directed or knowingly participated in the imprudent management of SAIF.  JPMAM employees directed the use of imprudent investments in SAIF and participated in using the temporary high rate of return for the risky bonds put into SAIF to cause SAIF to be the sole Stable Value option in all JPMRPS Plans, including the GEHA Plan.

   23. James E. Staley, an individual, is a New York resident.  He held officer positions in various JP Morgan entities.  At times relevant to the claims asserted herein, he was the CEO of JPMAM and held other high management positions with JPM entities. Staley orchestrated the purchase of JPMRPS (then called American Century Retirement Plan Services) in 2003 from American Century Investments, and held ultimate decision- making authority over and directly participated in the activities alleged herein. Staley was presented in meetings with direct evidence of the higher risks inherent in the JPM Stable Value Product and, despite that knowledge, he permitted, directed and encouraged the promotion of the JPM Stable Value

Product through the JPMRPS. As head of investment management at JPM, Staley pushed for inclusion of JPM proprietary products, like the JPM Stable Value Product, as a part of its clients' investment options, to the exclusion of the better performing and safer stable value funds. His actions and directions created the scheme that is the subject of this case. His motive was to increase the profits at JPM at the expense of, in this case, Plaintiffs.

24.    For the purpose of the acts alleged herein, the corporate Defendants are alter egos of JPMRPS and/or Chase Bank and operate as an instrument of JPMRPS and/or Chase Bank to achieve profit goals and to commit the breach of duties alleged herein.  For purpose of this Second Amended Petition/Complaint and because of the knowing participation in the acts alleged herein and because of the alter ego and interlocking agency relationship of each JPMorgan entity, all references herein to "JPM" or to "JP Morgan" are inclusive of and by definition include all Defendants.

25.    Defendants have participated as conspirators in furtherance of the willful misconduct and breach of fiduciary duty set forth herein or have acted with or in furtherance such wrongful acts in carrying out their purposes as alleged in this Complaint.

## JURISDICTION AND VENUE

26.    Based on this court's order dated June 16, 2014, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because certain of claims stated herein arise under and/or preempted by the laws of the United States, including specifically ERISA §502(a), (e)(2), 29 U.S.C. § 1132(a), (e)(2). Plaintiffs respectfully reserve their position to the contrary, that the court rejected, as presented in its Motion to Remand.

27.    The Court has personal jurisdiction over Defendants because the causes of action asserted herein arise out of their alleged tortious, inequitable and wrongful acts, which caused

injury and damage to the Plaintiffs in Jackson County, Missouri.  Additionally, the Court has personal jurisdiction over Defendants because they are subject to general and specific jurisdiction in the State of Missouri.

28.     Venue is proper in the United States District Court for the Western District of Missouri pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claim arose in the Western District of Missouri, and because the GEHA Plan was administered by JPMRPS in the Western District of Missouri.

**CENTRAL AGREEMENTS, LEGAL PRINCIPLES AND PRODUCT DEFINITION**

29.     The SAIF was and is "established, operated and maintained" by Chase Bank. In its Declaration of Trust, Chase Bank assumed the role of Trustee and ERISA fiduciary:

> *"Section 1.1.* **Title.** The title of the trust fund hereby established shall be 'Commingled Pension Trust Fund (Stable Asset Income) of JPMorgan Chase Bank, N.A.' (formerly known as the Bank One Asset Income Fund).

> *Section 1.2.* **Purpose.** JPMorgan Chase Bank, N.A., a national banking association. . . is adopting this Declaration of Trust as successor trustee to the Bank One Trust Company, N.A. of the Bank One Stable Asset Income Fund. . . This commingled trust fund is established, operated and maintained by JPMorgan Chase Bank, N.A. exclusively as a medium for the collective investment and reinvestment, without distinction between principal and income, of moneys or other assets of participating trusts.

> *Section 1.3.* **Definitions.** … (d) The term "Trustee" shall mean JPMorgan Chase Bank, N.A. . . .

> *Section 1.4.* **Effect of Declaration of Trust.** The provisions of this Declaration of Trust, as the same may be amended from time to time, shall control all participations in the Commingled fund and the rights and benefits of all persons interested in such participations as beneficiaries or otherwise.

> *Section 4.1.* **Title, Custody and Location Investments.** The ownership of all of the assets in the Commingled fund shall be

vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee.

*Section 4.3.* **Additional Investment Provisions.** . . . the Trustee shall have the power to: (1) invest and reinvest any moneys at any time forming any part of the Commingled fund in any property. . .

Trustee shall invest the assets of the Commingled Fund in a manner consistent with the provisions of ERISA. . .(e) The decision of the Trustee as to whether or not an investment is of a type which may be purchased for the Commingled Fund shall be conclusive.

*Section 4.4.* **Additional Powers of the Trustee.** . . . (g) to cause or authorize any investments from time to time held by it to be registered in, or transferred into its name as Trustee, or the name of its nominee, or in the name of any other nominee, or to retain them unregistered or in form permitting transferability by delivery; and to deposit any such investments in or with any depositary, sub-custodian, clearing corporation, or any central system for handling of investments, or any nominee thereof; but the books and records of the Trustee shall at all times show such investments are part of the Commingled fund;. . .

*Section 5.1.* **Division into Units**. The Commingled Fund shall be divided into units and the proportionate interest of each participant shall be evidenced by the number of units and fractions of a unit allocated to it based upon the amount of the moneys of such participant paid into the Commingled fund. The original value of each unit of participation shall be determined by the Trustee. . .

*Section 6.1.* **Frequency of Valuation.** . . . the Trustee shall determine the value of the Commingled Fund and the units thereof in the manner prescribed in this Declaration of Trust. . .

*Section 8.1.* **Participation Records.** Records shall be maintained for the Commingled Fund which shall show with respect to each participant:

(a) The date of each admission to the Commingled Fund, the number of units allotted and the amount paid therefor;

(b) The date of each withdrawal, the number of units redeemed, the amount paid on redemption to the participant and whether payment was made in cash, in kind or partly in cash and partly in kind:. . .

14

**ARTICLE IX.  MANAGEMENT FEES AND EXPENSES**.
**Commingled Fund-Institutional Class:**  . . . The Trustee shall
charge a management fee directly against the Commingled Fund-
Service Class in the amount of 45 basis points (0.45%)

**ARTICLE XIII. ACCEPTANCE OF TRUST AND TRUST
FUND.**  JPMorgan Chase Bank, N.A. by execution of this
Declaration of Trust hereby signifies its acceptance of the trust and
trust fund created hereunder and acknowledges that as Trustee it is
a fiduciary with respect to each participating trust which is an
employee benefit plan subject to ERISA."

30.     The Plaintiffs' Plan authorized the "Trustee [Chase Bank] to invest assets of the

Plan in the Fund." And the Plan authorized that Chase Bank "shall be entitled to compensation

for its management fee."  The Plan appointed Chase Bank as "the Trustee of the Plan with

respect to assets of the Plan invested in the [SAIF] Fund."  Chase Bank "agreed to and accepted"

these terms. Chase Bank breached this agreement by shifting a portion of its management fee to

JPMRPS.

31.     At all times relevant to this Complaint, Chase Bank acted as a fiduciary within the

meaning of ERISA to GEHA and the Plaintiffs.  See ERISA § 3(21)(A)(i), 29 U.S.C. §

1002(21)(A)(i); see also, inter alia, Article XIII of the Declaration of Trust cited above.    In

401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars

in individual 401(k) accounts. The accounts provide a number of investment alternatives into

which employees place a portion of their current income with the hope of earning, over time, a

return sufficient to support themselves and their families in retirement.  Accordingly, in 401(k)

plans, the return on employees' investments is critical. Even seemingly small reductions in a

participant's return in one year may substantially impair his or her accumulated savings at

retirement.

15

32.     ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan. (Emphasis added).

33.     ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A)&(B) require that the Plan's fiduciaries "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and ".  .  . for the exclusive purpose of.  .  . providing benefits to participants and their beneficiaries."

34.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary:

> . . . shall not cause the plan to engage in a transaction,… if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest … furnishing of goods, services or facilities between the plan and a party in interest; … transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

35.     For purposes of section 406, a "party in interest" is any plan fiduciary, including the trustee, officer or custodian, [and] any plan services provider, .  .  .  ERISA § 3(14), 29 U.S.C. § 1002(14).

36.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal

16

account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

37.     JPM violated each of the involved ERISA sections above cited. At all relevant times, Chase Bank acted as Trustee for SAIF despite multiple, layered conflicts of interest caused by its self-dealing in investment products originated by JPM, sold by JPM and put into SAIF – a product inserted into the Plaintiffs' Plan and sold by JPM to Plaintiffs and others in return for management and other fees.  At all relevant times, JPM purchased and retained concentrated, illiquid, undiversified investments in lower quality mortgages and other debt instruments, with higher risk than prudent management of a pooled stable value fund would allow. JPM also invested in illiquid, self-rated mortgages that it generated internally – that, by itself made SAIF a bond fund with a higher risk profile than appropriate for a stable value fund.

38.     By definition and by the logical demands of the book value withdrawal rights inherent in the pooled stable value product, prudent management requires making bond investments that accept is a modest "duration" or "horizon" risk (sometimes also called "interest rate" risk) of 2-4 years, but significantly dampen and control for credit, liquidity and other risks. Goetzmann Rpt. at 2-25 to 2-44. Forms of risk in bond investments such as credit risk, liquidity risks, lack of diversity risks, mortgage prepayment risks, and volatility risks from use of leverage are not part of prudent risks and must be carefully controlled. Yet, JPM's investment decisions deliberately, knowingly and materially created greater than prudent risks—in a self-interested reach for "yield".  JPM's pooled stable value product became a non-diversified, lower quality intermediate bond fund operating outside of acceptable risk parameters for a pooled stable value fund.

39.     The purpose of the crediting rate formula in a stable value product, which drives market value to book value, is to handle moderate market value deviations from book value. This feature is necessary for a product with cash flow or liquidity needs to meet book value withdrawal rights. This crediting rate formula was never intended to correct for major market value losses, arising from a financial crisis or other adverse credit event, that all bond markets periodically experience. To the contrary, this product should be managed to withstand major adverse credit events like the 2008 financial crisis and make the investors "winners" when adverse conditions like the financial crises occur.

40.     Because JPM used its industry low crediting rate to confiscate the earnings of an impaired bond fund and to repair the industry high losses of its bond portfolio caused by the imprudent management of SAIF, JPM breached its fiduciary duty and breached Missouri law during 2009-2012.

41.     JPM created roadblocks to prevent Plans from withdrawing from SAIF.   JPM gave the Plans "credit" i.e., a mark down off of JPMRPS's administrative fee if SAIF was included in the investment line-up.  JPM made SAIF the sole investment safe harbor stable value fund in JPMRPS's line-up of investment options. Thus, participants in SAIF were saddled, disproportionately, with JPMRPS's administrative fee by including that fee in the total fee charged their individual accounts. In other words, participants in SAIF paid from their already reduced crediting rate not only the SAIF "management" fee but also JPMRPS's administrative fee.  In the MPPF (a SAIF investment), JPM also "gated" or prohibited Plan withdrawals as to its Private Mortgages during a portion of the damage period.

## JPM PUSHED SAIF INTO PLANS TO GAIN $2 BILLION PROPRIETARY AUM

42.     The allegations in this Petition are supported by findings of an arbitration panel that issued a $373 Million breach of contract award against JPMRPS on August 10, 2011 for promotion of its proprietary products over American Century's products– over $130 Million of that Award was for JPM's promotion of SAIF over the prudently managed stable value product offered by American Century. Defendants Staley took a leadership role in this scheme. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Ex. B, Arbitration Award ¶¶ 34-35, 38, 39, 42, 69, 73, 88. See also, ¶ 41("availability of [SAIF] … was the end for ACI's ACSAF").

      a.     Prior to setting up SAIF, JPM had never managed a pooled stable value fund. JPM acquired SAIF as a "competing fund" to the American Century Stable Value Fund ("ACSAF") traditionally marketed to JPMRPS clients like GEHA. Through JPMRPS's control of its retirement distribution channel it **"cannibalize"** American Century's clients within Plans administered by JPMRPS. Award ¶¶ 34-35; Ex. 1423H. The GEHA Plan was one of the Plans Dr. Goetzmann analyzed in his expert report. Dr. Goetzmann Rpt at App. 2-2 Page 1.

      b.     Plaintiffs became collateral damage in the scheme to attract AUM by designing a bond fund that took on more risk than a fiduciary should take on in a pooled stable value product in order to temporarily produce a higher rate of return—in major part achievable solely because JPM invested in lower quality bonds that paid a higher yield than higher quality bonds paid out. Award ¶¶ 38-40. Historically, Defendants used this temporary high rate of return to cause a "run" on the ACSAF and, like GEHA, to cause it to insert SAIF into the line-up – not ACSAF. This enabled JP Morgan to capture the approximate $2 Billion AUM available in JPMRPS's administered Plans for the pooled stable value fund "slot" or line-up option.

      c.     JPM's "defense" in the arbitration was that SAIF was a "better" managed, higher yielding fund than ACSAF for JPMRPS clients like GEHA. Thus, Dr. Goetzmann was asked to address whether SAIF's higher yield was the result of prudent management. He found that JPM took on more risk than prudent in order to temporarily gain a higher yield. The arbitration panel awarded American Century $132.6 Million.  Award ¶ 88.

43.     On its web sites and in the publicly distributed materials known as the quarterly "Fact Sheets," JPM represented that SAIF was, "your most conservative investment option" having "consistent," "steady returns" – classic, inherent product definitions of stable value funds.

44.     Further, JPM inserted SAIF in the "line-up" of investment options – as the "default" option to represent the "safe-harbor" investment in JPMRPS's administered Plans. To further promote the capture of the AUM, JPMRPS offered to accept a portion of the total fee charged Plaintiffs' SAIF investment as a "credit" or offset to the Plan's administrative fee that JPMRPS charged. SAIF participants - not the Plan Employers - paid JPMRPS's fee and, in return, received a mismanaged JPM Product.

## JPM'S IMPRUDENT MISMANAGEMENT

45.     SAIF used undisclosed and improper leverage to acquire a concentrated, non-diversified portfolio overweighed in non-agency mortgages and other real-estate backed debt instruments that had a higher risk (in terms of liquidity risk, non-diversification, prepayment risk, duration risk and credit risks), and higher volatility than prudent for a pooled stable value product.

46.     JPM's motive was that by taking these risks with these higher yielding assets placed into the fund, that "high yield" would attract and keep more investments into SAIF, earning yet more management and administrative fees for JPM.

47.     JPM's scheme was not prudent management for a stable value fund for at least five major reasons:

> First, JPM's investments departed fundamentally from the benchmarks – the Lehman Barclay's Aggregate Intermediate Bond Index used by its main investment fund, the IBF, that SAIF invested in. JPM greatly exceeded the risk parameters defined and

imbedded in the represented benchmark of the JPM fund that constituted SAIF's dominant environment.

Second, JPM underweighted U.S. Treasuries and invested in low quality, non-agency mortgage back securities, included subprime and option-ARM mortgages imbedded in the mortgage back securities in SAIF. JPM invested in other low-quality asset back securities ranging from collateralized car loans to credit card debt backed instruments and utilized exotic complex instruments such as interest-only mortgage derivatives and inverse floaters – all not suitable for a pooled stable value fund.

Third, JPM (unlike any other stable value fund) invested in illiquid commercial private mortgages-much of which JPM itself generated, self-rated and then self-valued (conflict of interest).

Fourth, JPM employed leverage which increased market value volatility and is contrary to industry standards and prudent management for pooled stable value funds.

Fifth, JPM's "reach for yield" in departing from benchmarks used by the underlying investment vehicles, in emphasizing non-agency mortgage backed assets, in its use of private mortgages resulted in the violation of the central tenant of prudent investment and the central definition of pooled stable value by constituting a fund that lacked diversity and had much too great a focus on real estate backed assets, especially real estate that did not have governmental agency backing.

48.     JPM was fully aware of the outsized, imprudent risks to its investment strategy for SAIF. To begin with, it is axiomatic that there is no "free lunch" in the bond market. In order to gain a higher return in bond investments, the bond fund must take on more risk. See, e.g. Dr. Goetzmann Rpt. at 2-27. The lack of prudence in taking on these risks in a pooled stable value fund with book value withdrawal rights was both obvious and well known in the industry before the financial crisis. See, e.g., Donahue, Paul J., "Plan Sponsor fiduciary Duty for the Selection of Options in participant-Directed Defined Contribution Plans and the Choice between Stable Value and Money market," 39 Akron L. Rev.9 (2006); "The Handbook of Stable Value Investments

edited by Frank J. Fabozzi 1998" (each cited by Dr. Goetzmann, Ex. A at 2-10, 2-14); Dr. Goetzmann Rpt. at 2-30.

49.    Moreover, before the financial crisis, JPM was selling more than $12 Billion in the lower rated mortgaged assets from its own proprietary holdings.  At the same time that similar low-rated and illiquid mortgage positions were placed in the JPM Stable Value Product, JPM was reducing its own exposure to lower rated mortgage loans through 2009. JPM saddled investors/purchasers of its JPM pooled stable value product with known, lower quality mortgage backed assets while at the same time marketing SAIF as the conservative investment with steady and consistent returns of a stable value product and retaining SAIF as the sole stable value option in all JPMRPS plans.

50.    Going into the financial crisis, JPM knew that SAIF contained larger amounts of low-quality mortgage assets than found in all other stable value funds. Yet, JPM kept participants in SAIF and continued to offer only SAIF as the stable value option for the JPMRPS Plan clients. From 2009-2012, Plaintiffs' SAIF's AUM in JPMRP's client Plans increased from $1.1 Billion to $1.7 Billion.  As with other participants, Plaintiffs in the GEHA Plan, made new retirement fund contributions into SAIF, as it remained the default option and the only conservation option in the GEHA Plan.

51.    One significant reason that a pooled stable value fund must be managed to undertake much less risk than JPM undertook is that an impaired fund where market value is significantly less than book value puts irreconcilable stress on the fund manager's inherent conflict of interest between his current investors and investors adding to the fund.  New money flows are immediately negatively subjected to the impaired fund losses and the need to substantially reduce the crediting rate to amortize those past losses. Candelmo Dep. 270.

22

52.     Thus, from 2009-2012, JPM sought new money flows to make up for its mismanagement. New contributions coming into SAIF from 2009-2012 helped absorbed the pain of the amortization of the more than $100 Million market value losses.

53.     JPM, at all material times just before, during and after the financial crisis, knew that its high-risk mortgage assets were being sold via touting SAIF as a "stable" and "conservative" investment product.  Those moves were undertaken by Defendants with an "eagle eye" to JPM's benefit and an indifference to the truth.

54.     JPM knew at the time it made the inappropriate investments, and in its retention of those assets in SAIF, of the added risks inherent in how it was managing SAIF and thus it knew that SAIF's crediting rate would suffer versus other stable value products' in a bond market decline. But because of JPM's self-dealing, conflicts of interest, and refusal to put Plaintiffs' best interests ahead of its own, JPM caused Plaintiffs to suffer ascertainable damages

55.     In 2009, the market value of the investments in SAIF fell to the mid-80% of book value, at the bottom of all stable value funds.  This type of volatility was exactly what a stable value product should be designed to avoid.

56.     Although the market value of the misnamed "SAIF" had declined in the hundreds of millions of dollars, JPM omitted and failed to keep Plaintiffs and other SAIF participants advised of the deteriorating value of SAIF's underlying assets.   JPM continued to market SAIF to the public as "stable value."  Plaintiffs' 2009 and following years' contributions suffered an immediate loss by buying into the fund at above the market or true value of SAIF's assets. Plaintiffs and other SAIF participants immediately suffered damages in the additional and the new contributions into SAIF. Candelmo Dep. 270.

23

57.     While this self-dealing benefited JPM in accumulating fees based upon the attraction of $1.7 Billion of assets in SAIF and in the transfer of fees to JPMRPS coming from Plaintiffs' retirement accounts, it harmed Plaintiffs and other SAIF participants, who were stuck with paying JPMRPS a "revenue share" (administrative fee) out of SAIF and with amortizing the market losses via the impaired crediting rate.

58.     JPM's "fact sheets" on its Stable Value Product are distributed on the Internet and updated on a Quarterly Basis. JPM defined its product to have classic characteristics of Stable Value - consistent and steady return, superior market-to-book value performance.  It did not, however, insert investments into the fund consistent with the industry-accepted pooled stable value funds.   SAIF contained demonstrably higher risk and inappropriate lower quality mortgages and other debt instruments, and contained illiquid private, self-rated mortgages that exposed Plaintiffs and others to more volatility to the effects of market value losses than prudent for stable value. Dr. Goetzmann Rpt. 2-61 to 2-67.   JPMAM and JPMRPS represented that JPM Product's portfolio of investments consisted of investment grade, fixed-income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed, asset-backed, and privately placed mortgage debt.

59.     On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive, Chase Bank, JPM consistently defined SAIF as a "1 (most conservative)" as invested in "investment grade" fixed income securities that would "earn consistent, reliable returns."  *Id. See* June 30, 2009 document entitled "Solutions: Stable Value Strategy."

60.     JPM grew SAIF by 100% in the year preceding September, 2008, increasing SAIF assets by $500 Million.  These new monies would, within months, suffer the largest market value losses in the industry.

24

61.     The concentrated, non-diversified, higher- risk mortgage positions and "small" allocations to U.S. government debt explain why the JPM Product temporarily (pre-2009) outperformed competitor stable value funds until the financial crisis, then fell behind its competitor funds, return-wise, by a wide margin.

62.     SAIF did not meet either the industry definition of a pooled stable fund or the definition given by JPM. SAIF was not a pooled stable value fund in reality.  The essential nature of stable value requires management of a pooled stable value fund such that participants cannot chase yield.

63.     SAIF's investments in securitized, non-agency mortgages such as "non-agency CMO's" and other debt instruments had a higher risk (in terms of liquidity, duration and credit risks) and lower quality than appropriate for a stable value product. Non-agency mortgage products in SAIF were "out-of-index": that is these products were not in the Barclay's Benchmark Index that SAIF's main investment vehicle utilized. Candelmo Dep. 16, 86-87.

64.     Unlike all other stable value funds in the industry, SAIF held proprietary mortgage assets JPM originated through the Mortgage Private Placement Fund ("MPPF") called "Private Mortgages."  In 2009, as much as 15% of SAIF's assets consisted of illiquid, unrated Private Mortgages.  The MPPF's "Private Mortgages" were commercial loans for which JP Morgan entities received various origination and loan fees and cross benefits with other "borrower relationships" and "strategic partners".

65.     By mid-2009, when the market value of the investments in SAIF fell to the mid-80% of book value, to the bottom of all stable value funds, properly managed pooled stable value funds had market values above 97% or even above 100%.

25

66.     At all relevant times, JPM failed to employ prudent Investment Guidelines for a pooled stable value Fund. Additionally, at all relevant times, JPM failed to disclose the true extent of impairment in SAIF's assets.

**SAIF INVESTED IN THE "IBF" — A "FUND-OF-FUNDS"**

67.     JPM utilized a fund-of-fund approach to manage SAIF.  SAIF invested in the Intermediate Bond Fund (called the "IBF") that, in turn, invested in other JPM bond funds such as the "MPPF", "PMF", Enhanced Cash Fund and the "MBSF".  JPM used these underlying bond funds that it created to take undisclosed and inappropriate risks — credit risks, duration (interest rate) risks, volatility risks from leverage – from lack of diversification and from liquidity risks, etc.

68.     JPM had historically used the IBF for separate accounts and continued that practice after starting SAIF, in other words, JPM never managed the IBF as an investment designed for pooled stable value funds.  By using an "all-purpose" IBF, JPM never managed SAIF as a pooled stable value fund with its particularized, product specific investment management needs.

69.     The IBF was a JPM bond fund product before JPM had any pooled stable value product. JPM found it cheaper to simply tag on to the IBF for SAIF's investment management as it added no additional investment fixed costs in a scalable fund.  Rather than establish a new fund and design an investment approach suited for a pooled stable value product, JPM took SAIF's assets and added them into the IBF. Thus, JPM's management fee charged SAIF investors simply fell to the bottom line.  For this reason, Plaintiffs' disgorgement of all fees is one of the appropriate remedies in this case.  29 U.S.C. § 1109.  This failure to manage for a pooled stable

26

value funds needs is primary evidence of JPM's breach of fiduciary duty.   See, Ex. A, Dr. Goetzmann Rpt. 2-30-31.

## SAIF NOT "INVESTMENT GRADE"

70.      Neither the Private Mortgages nor significant portions of its non-agency asset backed securities embedded in the JPM Product were "investment grade".   The Private Mortgages were never rated by a third-party credit-rating agency, which would have produced an objective credit rating for such mortgages.   JPM self-rated all Private Mortgages and itself determined the market values for the Private Mortgages and other unrated securities. Its independent auditors provided no independent audit verifications; instead the auditors cautioned JPM that the values JPM calculated could materially differ from actual value.

71.      SAIF held substantial positions in non-agency CMO's issued by Countrywide, Bear Stearns, Lehman and other known purveyors of sub-prime and low quality mortgages.  No other pooled stable value fund held substantial positions in these low quality, mortgage backed investment assets. Further, SAIF had only a "small" allocation to U.S. Treasury, (generally less than 5%) and an "overweight" to public mortgages. Candelmo Dep. 41, 72.

72.      In 2010, the same year that JPM revamped SAIF's investment guidelines, SAIF non-investment grade ratings within its non-agency mortgage backed assets escalated as shown in internal JPM reports.  A sampling of SAIF portfolio holdings in 2010 reveals:

| CUSIP | Issuer | Fund Name | Mid Sector | 2010 Rating |
|---|---|---|---|---|
| 02147PAN | Countrywide | JPMCB Intermediate Bond Fund | CMO's | C |
| 93934NAQ | WaMu | JPMCB Intermediate Bond Fund | CMO's | C |
| 225451AS | Credit Suisse | JPMCB Mortgage Private Placement Fund | Commercial Property | C |
| 92922FY7 | WaMu | JPMCB Mortgage Private Placement Fund | CMO's | CCC+ |

| 200476AS | Commercial | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
|----------|------------|----------------------------------------|---------------------|------|
| 225451AN | Credit Suisse | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 2254ERAY | Credit Suisse | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 36298UAQ | GS Mortgage | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 52524NAW | Lehman | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 92976BHY | Wachovia | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 92976BHZ | Wachovia | JPMCB Mortgage Private Placement Fund | Commercial Property | CCC+ |
| 32052JAA | First Horizon | JPMCB Public Mortgage Fund | CMO's | C |
| 12567AAG | Citimortgage | JPMCB Public Mortgage Fund | CMO's | C |
| 020908AD | Countrywide | JPMCB Public Mortgage Fund | CMO's | C |
| 02151NBH | Countrywide | JPMCB Public Mortgage Fund | CMO's | C |
| 12668BFD | Countrywide | JPMCB Public Mortgage Fund | CMO's | CCC+ |
| 12668BZM | Countrywide | JPMCB Public Mortgage Fund | CMO's | CCC+ |
| 02147QAG | Countrywide | JPMCB Public Mortgage Fund | CMO's | C |

73.     During the damage period, 2009-2012, SAIF, by imprudent management, held as much as 40% of its assets in below-investment grade or illiquid assets not suitable for a pooled stable value fund.

74.     JPM had taken over Bear Stearns _after_ Bear Stearns' problems had become well-known and it was under threat of government takeover.  Reports obtained in this case show that the MBSF, MPPF and PMF each held instruments created by Bear Stearns. SAIF continued to hold Bear Stearns created mortgage products after its acquisition when prudent investing would have required disposal of these products.  This self-dealing in assets issued by an acquired company presented a conflict of interest in JPM's investment decisions.

## MBSF – MORTGAGE BACK SECURITIES FUND

75.     The MBSF had invested over 27% of the Fund in non-agency CMOs, meaning that these Collateralized Mortgage Obligations ("CMOs") had no United States agency or quasi-governmental backing.  The non-agency CMOs were issued by entities known to have packaged subprime or inferior quality mortgages into the CMOs these entities sold. SAIF held, for example, CMOs called "Countrywide Alternative Loan Trust", "Countrywide Home Loan Mortgage Pass - Throughs", "Bear Stearns" "Indymac",   and "WaMu Mortgage Pass Throughs." Use of these CMO's with riskier mortgages - not "high quality"- was inappropriate for a stable value fund.

76.     By September 2008, the same month as the Lehman bankruptcy event, these non-agency CMOs in the MBSF, for example, had lost  $14 Million and would go on to suffer further losses, as shown in recently obtained documents.

## PMF – PUBLIC MORTGAGE FUND

77.     As of September, 2008, the Public Mortgage Fund ("PMF") had approximately $1 Billion invested in non-agency CMOs that constituted over 20% of the PMF.

78.     After Lehman collapsed, the PMF still had $916 Million in non-agency CMOs but these investments had suffered a substantial loss of market value to $758 Million ---- a $160 Million Loss in these non-agency CMOs.

79.     JPM actively traded the positions in the PMF selling as much as $20 Billion and buying as much as $20 Billion in non-agency CMOs in one year. It never, however, backed itself out of these high-risk positions until forced to do so until its insurance wrapper imposed new investment guidelines in January, 2010.

80.     Close to 60% of the decline in value the IBF as of y/e 2008 was attributable to the PMF. The PMF was the largest contributor to IBF's overall leverage and overall decline. In 2008, it was leveraged by over 100%. The PMF housed many of the IBF's investments in non-agency mortgages, Internet Only Loans ("IOs"), Principal Only Loans ("POs") and Inverse Floaters.  JPM would later terminate the chief officer of the PMF's investment process.

### MPPF – MORTGAGE PRIVATE PLACEMENT FUND

81.     In September, 2008, Chase Bank held 58.7% of the MPPF in Private Mortgages.  Chase Bank arbitrarily reported its market value of investment in its Private Mortgages "above Book" as $3.6 Million based on its self-valuation of those mortgages for which no market existed.  But for the "self-valued" Private Mortgages being set by JPM at above book value, the industry low market-to-book value of SAIF would have been even lower.

82.     By its name, the Mortgage Private Placement Fund ("MPPF") implies that privately placed mortgages are held in that Fund. However, as reported in September, 2008, the MPPF held 9.1% in publicly traded Commercial Mortgage Backed Securities and 6.8% in publicly traded non-agency CMOs.  This publicly traded, 17% component of the MPPF showed a loss of $123 Million in the Commercial Mortgage Backed Securities and $90 Million in the non-agency CMOs. Unsurprisingly, these two segments with high market value losses, contained mortgages created by Chase Bank's affiliate Bear Stearns, by Lehman, and by Countrywide.

83.     By September, 2008, the MPPF showed a market value loss of $535 Million (even after the Private Mortgages had been self-valued at above book value).

84.     The MPPF was responsible for about 20% of the IBF's reported decline in value as of the end of 2008. Because the MPPF also employed leverage; its market value losses were magnified.

85.     In 2009, JPM "gated" the MPPF private mortgages, meaning that Plans could not withdraw from SAIF and receive book value as to the Private Mortgages piece of SAIF.

## ENHANCED CASH FUND

86.     The Enhanced Cash Fund was responsible for about 20% of the IBF's decline in value as of 2008. That Fund invested in out-of-index mortgage-backed securities. That Fund was also leveraged. JPM's new 2010 Investment Guidelines removed this fund from SAIF's investment option.  By JPM's admission, this Fund should never have been in a pooled stable value fund from the inception.

## JPM'S INVESTMENT IN "OUT-OF-INDEX" MORTGAGE PRODUCTS

87.     JPM employed the Barclay's Intermediate Aggregate Index as the Benchmark for the IBF. Candelmo Dep. 16. This benchmark held mortgage-backed securities insured by government agencies such as Fannie Mae and Freddie Mac (referred to in the industry as "agency MBS"). Such securities are relatively safe because the agency status ensures against default and requires the mortgages to conform to relatively more stringent standards.

88.     JPM, by contrast, invested a large portion of the IBF and thus JPM's Stable Value Funds in non-agency MBS and certain types of agency CMOs that are riskier than agency MBS. Thus, JPM constructed SAIF to have greater exposure to interest rate, prepayment, and credit or default risk. These investments in non-agency mortgages were "out-of-index". Candelmo Dep. 87.

89.     Instead of investing in agency MBS appropriate for stable value, SAIF invested in CMOs that: (1) were secured by unstable collateral; and/or (2) took exotic forms that resulted in volatile cash flows from these investments.

90.     Given the conservative demands of pooled stable value fund investment, a prudent and careful manager of pooled stable value funds would have selected only high quality investments with stable cash flows. "Substantial resources and analytics are required to properly select investments within [the mortgage-backed and asset-backed] sectors, particularly where cash flow volatility could impact returns and crediting rate behavior."[1]

91.     Further, of the non-agency mortgage-backed securities in which JPM invested during the relevant time period, over 30% were secured by subprime mortgages and over 12% were secured by option Adjustable Rate Mortgages ("ARM"). JPM caused SAIF to invest in mortgage securities that were lower rated, poorer quality (but higher yielding) when first purchased. Predictably, these lower rated mortgages suffered more in lost market value and in loss of credit rating than higher quality mortgages during the financial crisis.

92.     JPM's CEO, Mr. Dimon, testified before Congress that prior to the financial crisis, JPM did not itself offer Option ARM mortgages because, in his view, "we did not think they were appropriate products for consumers." Imprudently, SAIF held assets in mortgage-backed securities backed by those same types of mortgages. At one point, over 10% of the non-agency CMOs held by SAIF were secured by Option ARM mortgages.

93.     Furthermore, many of the mortgages underlying the non-agency mortgage-backed securities in which JPM invested Plaintiffs' retirement funds were written  without  adequate documentation  of  the borrower's ability to make the mortgage payment (referred to as "liar loans").

94.     JPM also invested about 3% of the IBF into interest only ("IO") and principal only ("PO") securities. IO securities do not support steady cash flows because, when interest

---

[1] Frank J. Fabozzi, *The Handbook of Stable Value Investments* (1998), 180.

rates decline, prepayments accelerate and the stream of payments from such securities is drastically reduced. PO securities suffer from the opposite problem: cash flows are high only where principal is paid off relatively quickly. While in theory such securities may cancel each other out if they are backed by the same underlying collateral, risks can be substantial if the collateral differs. Worse, a substantial portion of the IBF's IOs were subordinate to other, higher classes of IOs such that interest payments on the IBF's IOs are reduced by shortfalls incurred by the higher classes of IOs. About 1.5% of the IBF's holdings were in IOs with this feature. Both IO and PO securities were Out-of-Index, meaning they were not in IBF's benchmark index.

95.     Finally, JPM invested about 1% of the IBF into inverse floaters. Inverse floaters have rates of return that decline significantly if interest rates rise. As the court held in California Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1044-45 (9th Cir. 2001), investment in inverse floaters violated ERISA's prudence rule as to a trust with "very conservative investment guidelines" such as those of a stable value fund.

96.     The fact JPM adopted new restrictions in 2010, substantially limiting its pooled stable value funds' investments in non-agency mortgage-backed securities and prohibited altogether investments in subprime or Alt-A mortgage-backed securities and complex mortgage derivatives such as IOs and POs admits that its investment decisions prior to 2010 were imprudent. JPM was forced by wrappers to change its Investment Guidelines to eliminate elements of its investment strategy that entailed taking on more risk than prudent for stable value.

97.     JPM's investment of SAIF assets in poorer quality, non-agency, poorly collateralized and/or exotic mortgage derivatives was inconsistent with the "character and aims"

33

of a pooled stable value fund when made and was thus a violation of its ERISA duties, including the duty of prudence, and loyalty.

## ILLIQUID PRIVATELY PLACED MORTGAGES
## INCONSISTENT WITH STABLE VALUE

98.     JPM was unique in investing pooled stable value fund monies in illiquid, private placement commercial mortgages. These private placement mortgages were not public securities. They were not traded publicly and were not objectively, independently rated by outside agencies such as Standard & Poor's or Moody's. Candelmo Dep. 211. Also, they were out-of-index. *Id* at 87.

99.     Because the value of these private mortgages was determined solely by JPM, this created an "inherent conflict".  See Goetzmann Rpt. at 2-41. It also made it "impossible to independently assess the credit quality of the fund". *Id*. According to JPM's auditors, the entire valuation of the Private Placement Mortgage Fund's portfolio of private placement mortgages was based on "significant unobservable outputs." JPM could not prudently manage SAIF with a lack of objective valuation data breach. JPM had a fiduciary duty to prudently and carefully calculate the crediting rate whose formula depended on correct valuation data.

100.    Further, by self-rating and self-valuing its "Private Mortgages" above the actual market value pre-2009 it artificially boosted SAIF's crediting rate and damaged the 2009-2012 investor.  This inured to the financial benefit of JPM and its agents/affiliates through not only the generation of additional fees on "assets under management" attracted to SAIF's higher crediting rate, but also through extending commercial loans to JPM bank favored relationships and through other undisclosed fees such as commissions, transaction fees, closing fees, etc.

101.    The fact that private placement mortgages were also illiquid, violated one of the central tenets of pooled stable value fund investing.  Goetzmann Rpt. At 2-25; Candelmo Dep. 210. Because privately placed mortgages increased liquidity risk, such "[d]irectly placed loans are not appropriate within any portfolio with liquidity demands."

102.    Moreover, SAIF's high risk credit exposure was incompatible with the high illiquidity, because: "any withdrawal from the fund automatically increases the percentage held in illiquid assets". Private Mortgages "represents an unusual and significant risk in a stable value portfolio." Goetzmann Rpt. at 2-40.

103.    For the year ending September 30, 2008, approximately 20% of the IBF's assets were invested in the MPPF. In turn, approximately 60% of the MPPF's assets at that time were invested in mortgage loans JPM had privately placed. That is, as of September 30, 2008, approximately 12% (or $4.3 Billion) of the IBF was in mortgage loans that JPM had itself placed. "A large position in illiquid investments is inconsistent with the liquidity mandate of the stable value fund". *Id.* at 2-28.

104.    Although these mortgage loans were largely funded by the Mortgage Private Placement Fund, on information and belief, a portion were originated, arranged and underwritten by affiliated JPM entities who in turn received substantial fees for these services from the borrowers.   These fees variously were called application, originating, placement, and underwriting fees.

105.    The private placement mortgages had always been an inappropriate investment given the conservative nature of pooled stable value funds. JPM ignored industry practices and sound practices in managing pooled stable value funds by its substantial use of Private Mortgages in SAIF.

106.    After much of the damage was done, JPM instituted in a prohibition from new SAIF investments in the Private Placement Mortgages. The wrappers required JPM to run-off its exposure to this illiquid investment. Paradis Dep. Ex. 409A.

107.    JPMs' placement of illiquid and arbitrarily-valued private placement mortgages within SAIF was contrary to the "character and aims" of a pooled stable value fund, was thus a violation of its ERISA duty of prudence and loyalty.

**JPM'S IMPRUDENT USE OF LEVERAGE**

108.    The use of leverage in stable value funds is inconsistent with "stable value" because it increases risk increases volatility and reduces liquidity. As a matter of basic finance theory, funds that use leverage exhibit greater volatility in net asset value and return than those that do not because leverage magnifies both investment gains and losses. Leverage requires payment of interest and pledging of assets. The fund's participants are paying the interest for the leverage in the Stable Value Fund and this interest acts as an additional expense charged by JPM to Plaintiffs incident to JPM's management. Pledged assets adversely impact liquidity. Also, it may lead to selling of assets at non-optimal times.

109.    Despite this, JPM used leverage in the IBF and the underlying Commingled Funds in which the IBF invested. At times, the IBF held investments with a market value of 140% or more of the net asset value of the fund (40% leverage).

110.    This use of leverage was imprudent and inconsistent with well-established standards and principles of stable value investing. Compounding its lack of prudence, JPM used this unwise amount of leverage to decrease rather than increase the level of diversification, i.e. it borrowed to increase exposure to non-agency mortgaged backed real estate assets.

## NON-DIVERSIFIED EXPOSURE TO REAL ESTATE

111.   ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C.§1104(a)(C). Over 50% of all JPMRPS Plans' assets were commonly invested in stable value funds as it becomes the most selected participant investment option during and after the financial crisis. Investors sought the safe harbor of a Plans' most conservative option in 2009-2012. SAIF thus became for JPMRPS, the major source of its administrative fee based on an approximate 15 basis point change taken out of each participants' crediting rate.

112.   In spite of JPM's positioning of SAIF as the safest option in the Plan which attracted the largest share of participants' annual retirement contributions, JPM managed SAIF not as stable value, but as a non-diversified intermediate bond fund.   Prudent investment management requires that securities portfolios be diversified because diversification reduces risk – essential for stable value. A diversified portfolio that includes several categories of fixed income securities should have a relatively stable return portfolio." Principles of diversification enable an investment portfolio to protect or avoid against downturns in one particular sector. Modern Portfolio Theory ("MPT") employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

113.   As a result of JPM's leveraging strategy, as well as its heavy investment in mortgage-related assets, the total exposure of JPM's Stable Value Funds to mortgages (mortgage-backed securities of all types plus private mortgages) in the IBF exceeded 109% of the entire net asset value of the IBF in late 2008.  Exposing close to or over 100% of JPM's

Stable Value Funds' assets to a single sector is per se a violation of ERISA's duty to diversify because such a high exposure to real estate created the "risk of large losses" in the event of a general downturn in the real estate market. JPM of course knew at the time it made these investments how poorly diversified they were.

114.    JPM's lack of diversification/overconcentration in residential mortgages created another risk to that pooled fund that arose from the fact residential mortgages have "negative convexity"—an attribute related to prepayment options in mortgages.   This leads to higher volatility in certain interest rate environments.   The option of prepayment "reduces "upside risk" but not "downside risk".   This adds to the weight of evidence of JPM's lack of prudence in its concentrated, non-diversified use of residential mortgage related assets.   See Goetzmann Rpt. at 2-66; Candelmo Dep. 273.

115.    Because of its lack of diversification, SAIF had only a "small", exposure to United States Treasury obligations – bonds that performed well in 2009-2012. Candelmo Dep. 41, 72, 271.

116.    JPM's high exposure to real estate losses, in addition to violating ERISA's diversification requirement, was inconsistent with the "character and aims" of stable value funds, which emphasize proper diversification as a means to protect the market value of the fund and  thus ensure steady returns and was a violation of its ERISA duty of prudence and loyalty.

### DUE TO JPM'S IMPRUDENT MANAGEMNT
### SAIF FAILED TO TRACK RELEVANT BENCHMARKS

117.    JPM used "out-of-index" securities that inserted higher risks into its stable value product such as non-agency (non-government backed) mortgage securities, private mortgages, 144A securities and corporate bonds. Candelmo Dep. 87. In other words, JPM invested in higher

risk investments than reflected in the Barclay's Intermediate Aggregate Bond Index, the benchmark index it claimed for the IBF.

118.    Although the IBF was the main investment vehicle for the JPM Stable Value Product, JPM managed the IBF in contradiction of its benchmark, in contradiction of the stated, published objectives of JPM's pooled stable value funds, and in contradiction of the basic tenants of managing a pooled stable value fund. The manager for the IBF during the relevant time was John Candelmo. He testified in the <u>American Century v. JPMRPS</u> arbitration, that his goal was to add "alpha" (return above the benchmark) to the IBF and that he departed from use of government backed or agency mortgages and from the use of U.S. Treasuries found in the Benchmark Index.

119.    In seeking "alpha", JPM's investment goal departed from the basic purpose of a stable value fund to achieve steady, consistent returns and avoid large losses of market value that threaten principal. Mr. Candelmo's testimony revealed a management approach imprudently unconcerned with the unique characteristics of pooled stable value funds.  "We try to achieve, add alpha or add additional performance versus the benchmark." Candelmo Dep. 24, 58.

120.    Mr. Candelmo adopted strategies that inserted undue risk to the market value of the JPM Pooled Stable Value Funds, and exposed the fund to market volatility causing unstable returns.  This violated basic tenets of stable value fund investing. Mr. Candelmo's testimony established that JPM acted contrary to what a prudent manager would do in managing fixed income portfolios for pooled stable value funds. Stable Value requires the investment manager to act in a manner "consistent with the goals of a stable value fund" and to adopt a "relatively low-risk profile."

121.    JPM claimed that the IBF followed the Barclay's Intermediate Aggregate Index as its benchmark. That Index is a non-leveraged portfolio consisting of investment grade bonds including U.S. Treasury securities, U.S. government agency bonds, pass-through mortgage-backed bonds issued by government agencies, and corporate bonds.

122.    JPM stated that the IBF's "target total risk" was "to be similar to that of the Benchmark." Prudent management required an investment strategy that allowed for a small amount of tracking error for the IBF and thus JPM's Stable Value Funds as compared that Intermediate Aggregate Index. Instead, JPM's SAIF, as a result of using the IBF as its main investment, failed to track the IBF's publicized Benchmark.

123.    JPM's strategy lacked the care, skill and prudence of a prudent manager of stable value in fundamental ways.

124.    First, neither stable value nor any relevant benchmark use leverage. JPM's substantial use of leverage should have caused JPM to predict before 2009 that its investment returns would be more volatile than those of the benchmark and more volatile than other, true stable value funds in any downturn in the bond market.

125.    Second, the IBF invested heavily in types of securities such as the non-agency mortgage-backed derivative securities that are outside the benchmark and carry more risk than the agency securities and U.S. Treasury bonds in which the benchmark invested. The presence of such a large percentage of out-of-index investments also should have caused JPM, if acting with prudence, to understand before the collapse of SAIF's market value in 2009 that the investment returns Plaintiffs were subjected to would be more volatile than those to which a prudent investment manager should expose participants in pooled stable value funds.

40

## PLAINTIFFS' RETURNS IN 2009-2012 WERE "COLLATERAL DAMAGE"

126.    Chase Bank used SAIF's high risk bond yield to attract investors and Plans away from other stable value funds which were prudently and conservatively managed as true stable value funds.  By taking risk inappropriate for pooled stable value products, it could, temporarily, promise a higher interest rate that it then used to market against and push out ACSAF in Plans administered by JPMRPS.   The motivation was simple:   Chase Bank profited from the management fee it charged on proprietary funds like SAIF.  JPM got that fee when SAIF was put into the plan line up of investment options, in place of another pooled fund.

127.    As reported in the national media on July 5, 2013, the Office of Comptroller of the Currency ("OCC") warned Chase Bank and/or its affiliates about wrongfully steering retirement plan clients into "in-house investment products". The OCC made undisclosed "findings" regarding Chase Bank's promotion of its own investment products over third parties for placement in retirement plans. JP Morgan Chase is also under investigation by the SEC concerning its sales of proprietary products. See Candelmo Dep. 289 (I've never seen someone at JPMorgan try to sell another manager's funds.").

128.    The Department of Labor is investigating JP Morgan Chase's purchases of mortgage debt securities for stable value funds it manages that are in 401(k) Plans.

129.    JPM controlled and steered Plaintiffs' stable value investment option away from safer and true stable value products, for the purpose of getting Plaintiffs into the JPM Product from which JPM could earn multiple disclosed and undisclosed fees including a fee (sometimes called "revenue sharing") for JPMRPS. Arbitration Award at 14-15, 21-23, 26-31. Goetzmann Rpt. at 2-37, 2-45.

130.    Plaintiffs and other participants in SAIF were collateral damage in JPM's scheme to enrich itself by capturing AUM in the $2 Billion "stable value slot" in JPMRPS's investment line-ups. The undisclosed and disguised higher risk (taken to temporarily gain a higher yield) predictably caused SAIF to perform poorly in terms of lost market value and reduced crediting rate during the financial downturn, starting in 2009 and continuing for several years. "Investors in JP Morgan's [Pooled] Stable Value Product paid for the significant decline in their stable value asset through lower crediting rate." Goetzmann Reb. Rep. at 19. See Dkt. No. 136, 5/02/14 at 3.

131.    JPMRPS profited by receiving monies equal to 50% of the disclosed management fee and by earning or receiving other substantial JP Morgan created internal incentive credits to promote JPM's product over non-proprietary products.

132.    JPM touted on a 2008 Fact Sheet available for months on the Internet that the "estimated annual return" for its SAIF investors would be between 4.25% and 5.25%.  But within one year – by June 30, 2009 – the actual "annual return" at SAIF had fallen to a gross crediting rate of 2%.

133.    The actual net crediting rate going into investor accounts (after JPM's fees) fell to 1.6%.

134.    JPM required Plaintiffs to make up the market value losses it caused by reducing the income credited to its investors' accounts.  In other words, JPM did not pay out all the yield received from its stressed investments. Rather, it held back a portion of that yield (i.e. interest payments) to buy assets to insert into the fund to make up for its losses. Plaintiffs would not have suffered the low-returns starting in 2009 if JPM had offered its investors, i.e. the JPMRPS Plans, a true stable value fund.

42

135.    JPM's mismanagement caused Plaintiffs and other plan participants in 2009-2012, to make up the shortfall between market value and book value. This breached its fiduciary duties to the 2009-2012 SAIF participants.

## INDUSTRY LOW PERFORMANCE OF SAIF

136.    JPM drew investors into SAIF by touting an "estimated annual return" of 3.75% to 5.5% and by touting "consistent return" and by making SAIF the only stable value option– the sole available source for investors seeking "stable value" and "consistent returns" – in the JPMRPS administered Plans. JPM never disclosed that SAIF had achieved its past performance by taking higher risk than other stable value funds.

137.    At the start of 2009, SAIF reported returns that were still over 3%, even though the market value of the SAIF investment had fallen.

138.    JPM's Product trailed its peers for each year since 2008 according to Hueler Analytics, an independent collector of data from major managers of stable value funds.  From 2009-2012, SAIF's crediting rate fell precipitously.  At the same time, relevant benchmarks greatly exceeded the JPM Product's yield, and competitors' stable value funds were consistently yielding much higher annual returns.  Had the JPM Product been prudently managed and had JPM not required the 2009-2012 investors to take an industry low crediting rate in order to buy assets to make-up for losses in market value, the JPM Product's yielded returns from 2009 through 2012 would have been substantially higher.

139.    Dr. Goetzmann presented SAIF's industry low crediting rate in the following graph:



Ex. 1425 in Arbitration.

140.    Hueler Analytics presented SAIFs industry low crediting rate compared with its poor relative credit quality investments as follows:



141.    JPM is pooled stable value fund "94" on the above graph. Hueler Analytics is showing that SAIF has the third lowest crediting rate combined with the second worst quality rating of its bonds. On a risk-return basis, SAIF is an "outlier" – the worst fund by far of its peers (represented by the other numbers on the graph).

## JPM CAUSED PLAINTIFFS' DAMAGES

142.    Although the exact amounts await requested discovery from JPM, Plaintiffs in the GEHA Plan (Evans, Ashurst and Adams cases) held an approximate $25 Million in AUM in SAIF from 2009-2012.  The estimated loss of Crediting Rate on this AUM – 2009-12 ---due to JPM's imprudent management can be obtained using the performance of prudently managed pooled stable value funds during the same time period, by the Hueler Analytics reports on other pooled stable value funds crediting rate, and by reference to relevant benchmarks.  The prudently managed ACSAF would also serve as a proxy for plaintiffs' damages.  Plaintiffs have also lost the compounding benefit that the lost earnings would have provided. This loss for all GEHA Plan Plaintiffs exceeds $4 Million.

143.    The following Table demonstrated how JPM's mismanagement cause Plaintiffs' lost earnings:

Table Comparing SAIF's Crediting Rate to Other Indices and Other Pooled Stable Value Funds

| YEAR | AVG GROSS RETURN to Plaintiffs in SAIF | Hueler Avg[2] | IBF Bench- mark[3] | ACSAF Bench- mark[4] | Hueler Top 10% | ACI Diver. Bond[5] | Barclay's Intermediate Gov/Credit[6] |
|---|---|---|---|---|---|---|---|
| 2009 | 2.36 | 3.152 | 6.46 | 4.6 | 4.16 | 7.82 | 5.24 |
| 2010 | 2.39 | 3.2218 | 6.15 | 4.2 | 4.12 | 6.95 | 5.89 |
| 2011 | 2.29 | 2.7471 | 5.97 | 3.1 | 3.50 | 7.85 | 5.8 |
| 2012 | 1.91 | 2.275 | 3.58 | 2.2 | 2.89 | 5.84 | 3.89 |
| 4 YR AVG | **2.24** | 2.852 | 5.54 | 3.53 | 3.67 | 7.1 | 5.21 |

144.    But for Defendants' self-dealing, improper investments, conflicts of interest and other breaches of fiduciary duty, JPM would not have been able to attract and then keep SAIF participants' monies in unduly risky mortgage debt. Plaintiffs and other SAIF participants should have benefited from significantly higher yields in 2009-2012 in line with other stable value funds that by definition are to contain high quality assets that weather (even appreciate) in financial crisis like 2008-2009.

---

[2] Hueler Avg brought down by SAIF's poor performance. The presented Hueler average is for all pooled stable funds in the Hueler Index except SAIF. SAIF's poor performance must be removed from the data to give an accurate picture of industry performance.
[3] Barclays US Intermediate Aggregate Bond Index Benchmark for IBF prior to 2010 – IBF was SAIF's main investment vehicle.
[4] Citi 1-5 C+G Index. (ACSAF tracked or exceeded that benchmark over long history)
[5] Used by Dr. Goetzmann in Arbitration, hedged to 3 year duration, as ACSAF performance proxy, post Sept. 2007 transfer because same strategy as ACSAF, same PM, etc. G. Rep. at 2-99.
[6] Cited by Hueler Analytics as a comparable benchmark in its "Market Commentary Fourth Quarter" (p.1).

145.    Defendants gained several advantages from the described wrongful conduct, starting with the quick build-up of assets in SAIF (100% increase in AUM in 2008) and the profits to Chase Bank.

146.    This underperformance relative to true stable value funds accretes daily as Plaintiffs have lost compounding effects.  JPM actively inhibited Plaintiffs and other SAIF participants from removing their stable value assets from the JPM Product and going to stable value funds with higher yields.  These actions violated ERISA because Defendants' conflicts of interest and imprudent management precipitated the problem. When faced with a conflict between the interests of the Plaintiffs and marketing and placing its own fund into the Plan, JPM chose to favor their own interests over those of the Plaintiffs and other participants in SAIF.

147.    JPM was at all times aware that stable value funds have unique attributes that can inhibit the ability of plans to withdraw or to move to other stable value products within a plan without hurting the product.  JPM knew that it could not permit a "run on the bank" as to SAIF. This is one reason why JPM's use of investments in SAIF with higher volatility, liquidity risk, credit risk, and duration risk flouts prudent investment practice and violates ERISA.  JPM's willful misconduct put SAIF at risk of a "run" unless it tied or kept Plaintiffs or others in the investment.  JPM, given its self-dealing and conflicts of interest, failed to protect Plaintiffs from the loss of market value in 2009 and from Defendants' subsequent use of a reduced crediting rate formula to attempt to recover from that loss.

148.    Prudent management should have led JPM, at a minimum, to take the action that it did not take until 2010. A prudent manager with the required care, skill, and diligence would have recognized that he could not run a stable value fund in the manner JPM managed the fund. Exposing Plaintiffs and other SAIF participants to the conflict of interest of JPM's scheme to

47

quickly grow the assets in SAIF (which meant profits to JPM) and the ability of Plaintiffs and other SAIF participants to have retirement monies in a sound stable value fund in 2009-2012 breached JPM's fiduciary duties.

149.    In the end, Defendants' unlawful scheme caused Plaintiffs and others to pay too much – both in the purchase prices that were above the true market value and in fees. This led to diminished returns or lower crediting rate in the JPM Product from 2009 to 2012 compared to all other stable value products.

150.    The annual returns on the JPM Product have been far less than they should have been if only assets of the required quality and liquidity had been placed into the JPM Product.

151.    Defendants were well aware that the actions complained of herein were improper. JPM sought to keep from the public its scheme. JPM agreed with the "wrap" insurers to keep from the public certain issues with the JPM Product.

## JPM ADOPTED NEW INVESTMENT PARAMETERS - ADMITTING THAT JPM HAD NOT BEEN MANAGING SAIF AS STABLE VALUE PRODUCT

152.    In 2010, the insurers pressured JPM to adopt new "materially constrained investment guidelines". Arb. Exs. 470, 409A (Paradis). These new guidelines were largely directed to new asset purchases. JPM installed percentage caps or limits on Commercial Mortgage Bank Securities ("CMBS"), and on Non-Agency Residential Mortgage Back Securities (5% cap and further limited to only AAA rated).

153.    JPM also changed its benchmark.

154.    JPM agreed to wind down its subprime and Alt-A Non-Agency residential MBS by mid-2012 and JPM agreed to not insert Private Mortgages into SAIF going forward. Thus, no new investments to the MPPF could be made.

48

155.    These new Investment Guidelines are an admission that JPM's management had been imprudent. The new restrictions barring use of higher risk mortgage securities in Chase Bank's pooled stable value funds demonstrated that JPM had not been managing its pooled funds as true stable value.

156.    Further, compounding the damage to the Plaintiffs, JPM "change[d] Crediting Rate methodology to accelerate the convergence between portfolio market and book values." Arb. Ex. 470. JPM thus lowered the crediting rate (i.e. payments to participant accounts) much below the actual yield on SAIF assets. JPM used the monies retained from the differential on the actual yield and the paid crediting rate to make up for the market losses it caused by running a risky bond fund until MV/BV reached 97%. This meant that the 2009-2012 Plaintiffs and other SAIF participants were "billed," for the losses JPM caused to the fund.

157.    Further, JPM changes were preceded by changes to the JPM public mortgage sector team that had placed the non-agency mortgages and produced much of the losses in the IBF. JP Morgan terminated Mike Pecoraro, Jen Garvey and Fred Loh, who had failed to prudently manage investments within the IBF.

158.    JPM summarized its January 2010 charges as follows:

"A comparison grid and full description of these new investment parameters is included in Attachment A and we have summarized these below:

- Identified wind-down sectors that will be reduced over time, including: non-agency residential mortgage-backed securities (RMBS), floating rate "enhanced cash" investments, backing forward mortgage commitments (instead of the traditional money market definition of cash) and complex mortgage derivatives.

- Implemented tighter limits on allocations to credit sectors, including BBB rated corporate debt, and to derivatives (specifically to be used only for replication or hedging purposes).

49

> - Expanded the list of prohibited investments. Any existing assets we hold that are on the list are subject to a "no new purchase" constraint and will be reduced over time."

(Ex. 409A, p. 3 in American Century Arbitration)

159.    A comparison of the old to the new investment guidelines were set out in the January 2010 Paradis letter as follows:

**Duration and Sector** *(Maximum Market Value % at the Client Account unless noted)*

| | Current Limit | New Limit |
|---|---|---|
| Duration | Intermediate Aggregate Index +/- 2 years | 4 years maximum |
| Corporate Sector | 60% Maximum | 30% Maximum, 20% sub-sector limit to industrial, utility, financial |
| Non-corporate credit *(supranationals, local government, foreign agencies)* | 30% | 10% |
| BBB- to BBB+ corporate debt | No limit | 15% |
| Asset-Backed Securities | 40% | 20% total, 10% sub-sector limit to credit cards, student loans, utility rate reduction, auto loans |
| Agency RMBS | 60% | 50% |
| Non-Agency MBS | 20% | 5% maximum, prime collateral |
| CMBS | 25% | 10% most senior class |
| Directly Placed Mortgage Loans *(only via MPPF)* | 25% | No new fund allocations |

| Issuer Limits | Current limit | New limit |
|---|---|---|
| Agency RMBS Issuer *(FNMA, FHLMC, GNMA)* | No limit | 25% |
| U.S. Government debt | No limit | No limit |
| STIF vehicle | No limit | No limit |
| All other issuers | 5% | 3% |
| CUSIP/Security ID *(excluding U.S. Government)* | 5% | 2% |

| New Purchase Quality | Current limit | New limit | New purchases prohibited: |
|---|---|---|---|
| Corporate/Non-Corporate Credit | BBB- | BBB- | • Non-$ international |
| Money Market | A2 P2 | A1 P1 | • Below investment grade |
| ABS/CMBS | BBB- | AAA | • Enhanced cash fund |
| | | | • Complex mortgage derivatives (IO, PO) |
| | | | • Non-convertible preferreds |
| Non-Agency RMBS | BBB- | AAA | • Non-Agency RMBS backed by sub-prime or Alt-A collateral |

(Ex. 409A p. 10 in American Century Arbitration)

160. <u>Prohibited</u> investments in the newly announced 2010 investment guidelines included:

- "Residential mortgage-backed securities, both passthrough and collateralized mortgage obligations (CMOs), and asset-backed securities with collateral consisting of Alt-A, Option ARM, Sub-Prime and/or reverse mortgages
- Bank loans not guaranteed by the U.S. federal government
- Direct private placements other than (i) Corporate Debt purchased pursuant to Rule 144A (ii) permitted STIFs and (iii) collective investment funds that meet these guidelines
- Complex MBS derivatives (including but not limited to IOs, POs, inverse IOs, inverse POs, inverse floaters, super floaters and Z-tranche bonds).
- Mezzanine CMBS
- Non-U.S. dollar denominated securities
- Collateralized debt obligations ("CDOs")
- Collateralized loan obligations ("CLOs")
- Collateralized bond obligations ("CBOs")
- Instruments, including commercial paper, issued by structured investment vehicles (excluding conduit structures)
- Auction rate securities
- Repurchase agreements (whereby the Account lends cash) reverse repurchase agreements (whereby the Account borrows cash)
- Corporate Debt issued by the Manager or an affiliate of the Manager, provided, however, that Corporate Debt of any entity becomes an affiliate of the Manager by merger or acquisition may continue to be held
  . . .
- Leverage (borrowing money), directly or indirectly, or to engage in any derivative or similar transactions other than Hedging Transactions or Replication Transactions"

(Ex. 409A p. 13 in American Century Arbitration)

161.    In an internal document dated August 2009, JPM discussed its new "Stable Value Risk Management Package" as follows:

**WIND-DOWN SECTORS** – Exceptions during transition period that are applicable until the transition date passes, at which time the Long-Term investment guidelines will then apply.
**Transition dates represent a target with credit facility in place and a deadline without credit facility**

| Sector | Sub-Category | Transition Date | Transition Strategy |
|---|---|---|---|
| Mortgage Derivatives | NY Portfolios | 9/30/09 | Reduce to 0% |
| Mortgage Derivatives | OH Portfolios | 9/30/10 | Reduce to 0 or 5%* |
| Non-Agency RMBS** | Sub-Prime | 5/31/11 | Reduce to 0% |
| Non-Agency RMBS** | Alt-A | 5/31/11 | Reduce to 0% |
| Non-Agency RMBS** | Prime downgraded < A | 5/31/11 | Reduce to 0% |
| Non-Convertible Preferreds/Hybrid Financials | | 5/31/11 | Reduce to 0% |
| Enhanced Cash Fund** | | 12/31/09 | Reduce to 4% |
| | | 5/31/12 | Reduce to 0%/de minimis |
| Collateral Backing TBAs | Enhanced Cash** | 5/31/12 | Reduce to 0% |
| Privately Placed Mortgage Debt | | 5/31/12 | Target <10% |
| CMBS | Mezzanine | 5/31/14 | Reduce to 0% |

*Varies based on wrap option selection
**Broader definition of cash equivalents (interest rate duration less than one year) may be used as collateral backing TBAs subject to 5% maximum by 12/31/09 and complete wind-down by 5/31/12.

(Ex. 470 p. 9 in American Century Arbitration)

162.    From 2009-2012, Plaintiffs and other SAIF participants received a lower rate of return than the JPM Product would have yielded if it had been prudently managed as a true stable value fund. There is thus a direct causal relationship between the losses to Plaintiffs in the low returns and defendants' unlawful conduct.

163.    Plaintiffs incorporate all the above allegations into each and every cause of action stated below.

## FIRST CAUSE OF ACTION – ALL DEFENDANTS
### (For Violations of ERISA – Breach of Fiduciary Duty)

164.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein into this cause of action. Plaintiffs assert this cause of action against Chase Bank and against the other Defendants that either assumed the role of fiduciaries or that knowingly participated in the breach of fiduciary duty set out in this complaint.

52

165.    Chase Bank is an admitted fiduciary to the GEHA Plan and the Plaintiff plan participants.

166.    ERISA §§ 404(a)(1) provides, in relevant part, that fiduciaries shall discharge their duties with respect to a plan solely in the interests of the participants and the beneficiaries. They must act for the exclusive purpose of providing benefits to participants and their beneficiaries.  ERISA fiduciaries must act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

167.    These fiduciary duties are known as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law" under applicable case authority.

168.    Put more broadly, a fiduciary must always administer a plan with "an eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  A fiduciary has an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and to convey complete and accurate information material to the circumstances of participants and beneficiaries.  And a fiduciary has the duty to avoid conflicts of interest, and to conduct an independent, thorough and honest investigation into, and to continually monitor, the merits of all the investments of a plan.

169.    Defendants violated ERISA § 404. Defendants did not give Plaintiffs the loyalty and candor required of a fiduciary and knowingly made investments imprudent for a stable pooled value product.

170.    ERISA § 406(a) prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

53

171.    ERISA § 406(b) prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

172.    ERISA § 406 broadly prohibits the kind of self-dealing in which JPM has engaged, as described above.

173.    Indeed, Defendants disregarded and violated each of its fiduciary duties. Defendants did not administer the plan in the interests of the participants, but instead in their own interests to maximize fees and in the interests of Chase Bank affiliates which also sought to maximize profits.  Defendants failed to manage SAIF as industry principles of pooled stable value fund management require. Defendants did not avoid conflicts of interest between themselves and the participants and – instead fostering them; nor did Defendant JPM conduct a thorough and honest investigation into the merits of the SAIF's investment strategy and decisions.

174.    Moreover, during and following the financial crisis, Defendants took no action to assist or direct the Plan or the Plaintiffs because of their inherent conflict of interest precipitated by the inclusion of the Non-Agency Mortgages and Private Mortgages in SAIF, and the probability of a "run" on SAIF if participants learned of the inclusion of the mortgage backed securities issued by entities like Lehman, Bear Stearns and Countrywide.  Accordingly, when faced with a conflict between the interests of the Plaintiffs and their own (and those of its affiliates), Defendants chose to favor its own interests over those of the Plaintiffs Plan, in direct violation of its fiduciary duties under ERISA.

175.    As a result of these actions and inactions, inter alia, Defendants' conduct violated ERISA §§ 404 (a)(1), 406(a), 406(b), 409 and other applicable sections of ERISA.

176.    Defendants' actions and inactions directly and substantially harmed Plaintiffs. Had the Fund consisted of prudent investments, it would not have seen its returns decline precipitously, and Plaintiffs would have far more money available in their Plan accounts.

### SECOND CAUSE OF ACTION
**(Violation of ERISA §§ 404(a)(1)(B) and (C) - Breach of Duties of Prudence and Diversification against all Defendants)**

177.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

178.    Chase Bank, JPMRPS, Staley and JPMAM were fiduciaries or, as discussed above, participated in concert with fiduciaries to breach the duties to Plaintiffs set out herein.

179.    A fiduciary must comply with the duty of prudence, which includes the duty to diversity. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

180.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily are limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the

risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …: (A) [t]he composition of the portfolio with regard to diversification, (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (c) [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R.§ 2550.404a-1(b)(2).

181.   JPM's conduct with respect to the Stable Value Funds, individually and in concert, violated – in numerous ways – their fiduciary duties of prudence and to diversify as alleged above.

182.   JPM's actions, individually and in concert, directly and proximately caused substantial financial harm to Plaintiffs. As a result of this wrongdoing, Chase Bank, JPMRPS, Staley and JPMAM are liable for all resulting loss and damage. Chase Bank, JPMRPS and JPMAM must also disgorge all monies they wrongfully made through use of the plans' assets.

### THIRD CAUSE OF ACTION
**(Violation of ERISA § 404(a)(1)(A) - Exclusive Benefit against all Defendants)**

183.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

184.   Chase Bank, JPMRPS, JPMAM and Staley were fiduciaries or, as discussed above, participated in concert with a fiduciary to breach this fiduciary duty owed Plaintiffs.

185.   ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.

186.    Despite the prohibition of ERISA Section 404(a)(1), as well as Section 406(1)(A), Chase Bank, JPMRPS, Staley and JPMAM, while fiduciaries, caused the Stable Value Funds to engage in a high risk, leveraged investment strategy as alleged above.

187.    Chase Bank, JPMRPS, Staley and JPMAM's aforementioned actions individually and in concert, were not in the best interest of the Stable Value Funds' participants and beneficiaries. Rather, Chase Bank, JPMRPS and JPMAM sought to inflate the yields for its Stable Value Funds for the purpose of the scheme alleged above to increase their market share in the stable value retirement investing market segment and causing more retirement funds to be invested in JPM's Stable Value Funds to gain profits at the expense of prudent management of a pooled stable value fund.

188.    Defendants' actions directly and proximately caused substantial financial harm to Plaintiffs. As a result of this wrongdoing, Chase Bank, JPMRPS, Staley and JPMAM are liable, for all resulting loss and damage. Chase Bank, JPMRPS and JPMAM must also disgorge all monies they wrongfully made through use of the plans' assets.

## FOURTH CAUSE OF ACTION
### (Violation of ERISA §§ 406(a)(1)(A) and (D)
### Prohibited Transactions against all Defendants)

189.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

190.    Chase Bank, JPMRPS, Staley and JPMAM were fiduciaries or, as discussed above, participated in concert with a fiduciary for the plans and their participants, including Plaintiffs.

191.   ERISA Section 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing a plan to engage in a transaction that they know, or should have known, constitutes a sale or exchange of property between the plan and a party in interest.

192.   Chase Bank, JPMRPS and JPMAM were parties in interest within the meaning of ERISA. A "party in interest" with respect to a plan includes any fiduciary of the plan, as well as any person providing services to the plan. ERISA § 3(14)(A), (B), 29 U.S.C. § 1002(14)(A), (B). Here, Chase Bank, JPMRPS and JPMAM were parties in interest because they were fiduciaries.

193.   Despite the clear prohibition of Section 406(a)(1)(A), Chase Bank, JPMRPS and JPMAM, while fiduciaries and parties in interest, individually and in concert caused the JPM Stable Value Funds to purchase and hold private placement mortgages that they themselves had arranged, originated, placed and/or underwrote, and the transfer of this lending opportunity was in violation of this section.

194.   In addition and despite the clear prohibitions of § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), Chase Bank, JPMRPS and JPMAM while fiduciaries and parties in interest, used the assets of the Stable Value Funds for their benefit through the receipt of fees by affiliates for their services relating to the origination, arrangement and underwriting of the mortgages.

195.   Chase Bank, JPMAM and JPMRPS used the placement of SAIF and the assets it which SAIF invested to benefit JPMRPS in payment of JPMRPS's administrative fees.  JPM pushed SAIF in the investment line-ups as a means of benefiting JPMRPS, while putting Plaintiffs' investment at risk.

196.   Chase Bank, JPMRPS and JPMAM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received from

borrowers with respect to such loans, as well as management and other fees received for managing such assets.

### FIFTH CAUSE OF ACTION
**(Violation of ERISA § 406(b) Prohibited Transactions against all Defendants)**

197.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

198.    Chase Bank, JPMRPS and JPMAM were fiduciaries or, as discussed above, participated in concert with a fiduciary for the plans and their participants, including Plaintiffs.

199.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits fiduciaries in their individual capacities from becoming involved in a transaction concerning the plan's assets when the transaction involves the fiduciaries' own interests or accounts.

200.    Despite the clear prohibition of Section 406(b)(1), Chase Bank, JPMRPS and JPMAM, individually and in concert, used the plans' assets to enter into private placement mortgage transactions involving JPM's own interests or accounts, i.e. mortgages that were originated, underwritten, and/or brokered by affiliates of JPM.

201.    Chase Bank, JPMRPS and JPMAM's efforts on behalf of the borrowers also violates section 406(b)(2)'s ban on acting on behalf of a party whose interests are adverse to the plan—here acting on behalf of the borrower in its dealing with the Mortgage Private Placement Fund.

202.    In addition and despite the clear prohibitions of § 406(b)(3), 29 U.S.C.§ 1106(b)(3), Chase Bank, JPMRPS and JPMAM received consideration for their own personal accounts in connection with causing the Stable Funds to acquire the mortgage assets at issue. This consideration included without limitation application, origination, placement, and

underwriting fees and yield spread premiums, as well as fees taken from Plaintiffs' Plan account and directed to JPMRPS.

203.    Chase Bank, JPMRPS and JPMAM must therefore disgorge all monies made through wrongful use of the plans' assets, including all fees and commissions received from borrowers with respect to such loans, as well as management and other fees received by for managing such assets.

## SIXTH CAUSE OF ACTION - ACCOUNTING
### (JPM Should Account for Lost Earnings and Account for its Fees and Profits Unjustly Collected)

204.    The Plaintiffs reallege and incorporate by referenced each of the preceding paragraphs as if fully set forth herein.

205.    The Court should order that Chase Bank, JPMAM and JPMRPS render an accounting of all transactions, disbursements and dispositions occurring in connection with, and/or in respect of, SAIF and assets invested in SAIF.  Further, as JPM has access and control of all Plaintiffs' investments in SAIF, the Court should require JPM to account for all lost earnings to Plaintiffs' Plan accounts in SAIF assets starting in 2009 and remedy the deficiency.

206.    Plaintiffs request that such an account include, without limitation, detailed and specific information regarding all fees and expenses earned by JPM from Plaintiffs' accounts and the investment in SAIF.

207.    Plaintiffs request that Chase Bank account for the details of all non-agency CMO's and other mortgages securities and all Private Mortgages causing loss of market value in SAIF assets that led to the low crediting rates from 2009-2012.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs request judgment and relief on its causes of action as follows:

A.     For a declaration that the Defendants, and each of them, have breached their ERISA duties to the Plaintiffs.

B.     For an order compelling the Defendants to make good to the Plaintiffs  and/or Plaintiffs' Plan accounts the losses resulting from Defendants' misrepresentations and breaches of their fiduciary duties; and to disgorge to the Plaintiffs all monies and all profits the Defendants made through their wrongful use of the Plaintiffs' assets;

C.     For imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plaintiffs, as a result of the aforementioned ERISA violations;

D.     For an order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the relevant ERISA plans' funds;

E.     For violation of Plaintiffs' causes of action in an amount equal to the amount of any losses to the Plaintiffs to be allocated among the Plaintiffs' individual accounts in proportion to their losses;

F.     For an award of costs and expenses pursuant to 29 U.S.C. § 1132(g);

G.     For an award of attorneys' fees and expenses pursuant to 29 U.S.C. § 1132(g) and other law;

H.     For an award for equitable restitution and other appropriate equitable and injunctive relief against the Defendants;

I.     For an accounting as requested herein; and

61

J.      For such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

WHEREFORE Plaintiffs hereby demand a trial by jury on all issues that are triable to a jury.


Dated:  September 5, 2014                    ROUSE HENDRICKS GERMAN MAY PC


                                    By:  /s/ Randall E. Hendricks
                                         Randall E. Hendricks      MO Bar #: 24832
                                         Lawrence A. Rouse         MO Bar #: 25064
                                         1201 Walnut, Suite 2000
                                         Kansas City, MO  64106
                                         Phone: (816) 471-7700
                                         Email: RandyH@rhgm.com
                                         Email: LarryR@rhgm.com

                                         *Attorneys for Plaintiffs*